**AFFIDAVIT IN SUPPORT OF APPLICATION FOR**
**SEARCH WARRANT**


Your affiants, Special Agent Don Sender of the Criminal Investigation Division, Internal Revenue Service (IRS) and Special Agent Robert Abrams of Immigration and Customs Enforcement (ICE) being duly sworn according to the law, depose and say:

This affidavit seeks authorization for a search warrant for the following locations on the grounds that there is probable cause to believe that the places contain evidence, fruits, and instrumentalities of violations of Title 26, United States Code, Section 7201 (Tax Evasion) and Section 7206(1) (False Income Tax Returns), Title 18, United States Code, Section 157 (Bankruptcy Fraud), and Title 22 District of Columbia Code, Section 2705 (pandering; inducing or compelling an individual to engage in prostitution)

## AFFIANTS' BACKGROUND

Your affiant, Don Sender, has been employed with the Internal Revenue Service, Criminal Investigation Division as a Special Agent ("SA") since August 2004. My responsibilities as a Special Agent with the IRS, Criminal Investigation Division include the investigation of possible criminal violations of the Internal Revenue laws under Title 26, the Bank Secrecy Act under Title 31, the money laundering statutes under Title 18, and related offenses. SA Sender has received over 25 weeks of specialized training relating to financial and criminal investigations at the Federal Law Enforcement Training Center ("FLETC"). SA Sender received instruction on investigative techniques and searches and seizures. SA Sender has been trained in the execution of financial search warrants resulting in the seizure of financial documents, tax related records, United States currency and items pertaining to other violations of the federal criminal code. SA Sender has also assisted other Special Agents in the execution of 9 search warrants related to financial investigations. Prior to becoming a SA Sender worked 9 years in the internal audit field for fortune 500 companies such as New York Life Insurance and AIG Global Real Estate. During this time SA Sender performed and managed audits of operational and financial departments within these companies. I graduated from the Rutgers University New Brunswick, NJ Campus in 1994 with a bachelors of science degree in accounting. SA Sender is a Certified Public Accountant in the State of Virginia.

SA Sender is currently part of a law enforcement task force assisting the United States Attorney's Office for the District of Columbia in an investigation of Fatima THOMAS for alleged violations of local pandering and prostitution statutes, and federal tax and bankruptcy laws. In this affidavit, SA Sender attests to the financial aspects of this investigation and is relying in part on the expertise and experience of other agents assigned to the Task Force and other senior IRS Criminal Investigation Special Agents.

Your affiant, Robert Abrams is a Special Agent with U.S. Immigration and Customs Enforcement (formerly US Customs and hereafter ICE), currently assigned to the Office of the Special Agent in Charge, Washington, D.C. (SAC/DC). SA Abrams investigates crimes relating to the sexual exploitation of children. SA Abrams has been an agent since 2003 and has basic, advanced, and on-the-job training in this investigative area. SA Abrams is ICE's representative to the Northern Virginia and District of Columbia Internet Crimes Against Children (ICAC) Task Force. SA Abrams has participated in and led federal, multi-jurisdictional, and international investigations and has been the affiant on search warrants in several federal judicial districts. SA Abrams is a graduate of the FLETC's Criminal Investigator Training Program, and the ICE Special Agent Training program. SA Abrams is responsible for enforcing federal criminal statutes involving the sexual exploitation of children pursuant to Title 18 United States Code, Sections 2251, 2252, and 2252A. SA Abrams also has experience conducting investigations related to federal narcotics violations.

Because this affidavit is being submitted for the limited purpose of securing a search warrant, not every fact known to your Affiants has been included.

## AFFIANT SENDER'S KNOWLEDGE

Based upon Affiant Sender's knowledge, training, experience, and participation in investigations involving tax crimes and financial fraud, Affiant Sender knows that:

1. Persons who engage in legitimate business enterprises will maintain books and records that accurately record and reflect the true income and expenses of their business. The true income and expenses of the business enterprise will be truthfully reported on all income tax returns, as well as other required reports and filings. Individuals who own and operate business ventures will legitimize their ownership by correctly recording their ownership interest on all legal filings and reporting requirements including but not limited to corporate charters, stock certificates, and corporate minutes.

2. Persons who wish to conceal and disguise their true personal income and assets will do so utilizing numerous methods including but not limited to, "skimming" (defined as diverting a portion of the currency proceeds from the business operation and failing to record those proceeds on the business accounting records), the use of nominee names, the creation of fictitious records, and other fraudulent devices.

3. Service industry businesses such as massage parlors and spas generate a substantial portion of their sales from cash customers, thereby making significant amounts of currency available to them for use in furtherance of potential tax evasion schemes. The currency is frequently maintained in bank safe deposit boxes, or in safes or other secure locations located at the residence and/or business of the individual involved.

4. Persons who engage in tax evasion through the use of "skimming" usually maintain an accurate record keeping system of the true income of the business in addition to the books and records maintained and utilized to report profit and loss to the IRS. The factual records, often referred to as a "second set of books" are retained by the owner(s) to record the distribution and division of "skimming proceeds." The "second set of books" is usually maintained by the business owners in either their residence or business location. Due to their illegal nature, these records are neither acknowledged to outside parties nor provided to accountants, bookkeepers or tax attorneys. Further, records documenting the deposit and/or the expenditure of "skimmed proceeds" are not provided to any accountant, tax attorney or bookkeeper nor are these records furnished to the IRS upon normal request or as a result of an IRS summons.

5. During the course of his training and experience as a special agent, Affiant Sender has learned that <u>businesses</u> generally keep records. The records are necessary for the owner to know if the business is profitable and to comply with laws such as the federal statutes relating to taxation. These records are kept in the usual course of business and record the business's income, expenses, and acquisition of assets. The following is a general list of records maintained by businesses:

- <u>Bank Records:</u> bank statements, cancelled checks, deposit tickets, deposited items, and loan documents.
- <u>Records of income:</u> sales invoices, receipts, receipt books, sales journals, journals and/or ledgers showing client billings and payments received from clients, contracts of sale, customer files, listings of clients and client correspondence.
- <u>Records of expenses:</u> receipts, invoices, cancelled checks, journals and ledgers of expenditures.
- <u>Records of asset acquisition and disposal:</u> titles, deeds, receipts, loan applications, and depreciation schedules.
- <u>Financial statements:</u> income statements, statement of cash flow, balance sheets, income and expense projections for the company.
- <u>Inventory records:</u> purchase receipts and inventory sheets.
- <u>Income tax records:</u> prepared income tax returns and copies of prepared income tax returns.

6. In addition, during the course of his training and experience as a special agent, Affiant Sender has learned that <u>individuals</u> also generally maintain financial records. The records are necessary for the taxpayer to keep track of their bills, track investments, and to comply with federal statutes relating to taxation. The records usually kept by taxpayers include:

- <u>Bank records:</u> bank statements for checking, savings, money markets, investment accounts, cancelled checks, deposit tickets, deposited items, loan records, and certificates of deposit.
- <u>Records of assets:</u> titles, loan application, loan files, receipts, deeds, stock certificates, bonds, loan records, and certificates of ownership.
- <u>Records of expenses:</u> receipts, invoices, travel itineraries, passports, and airline tickets.
- <u>Business records:</u> all of the records listed in the preceding paragraph.

7. When individuals involved in illegal financial crimes, such as tax evasion, accumulate large amounts of cash from transactions they often attempt to legitimize these profits or attempt to disguise them. The individuals engaging in these types of crimes can launder their "skim" proceeds through transactions including, but not limited to, wire transfers, securities, cashiers checks, money orders, real estate and/or the diverting of currency earned from the criminal fraud activities through corporate entities. These individuals may also establish sham loans or gifts to friends and relatives. It is typical for these individuals to maintain the records and instruments identifying these transactions in their residence and businesses, either in hard copy or maintained in computer files.

4

8. Taxpayers also keep items in their residences which indicate they are spending more money than they report as income on their income tax returns. These items are usually assets such as jewelry, precious metals, furs, artwork, furnishings, firearms, large hoards of currency, and investments. In addition, they maintain documentation to record expenses relating to travel.

9. The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, such as income tax evasion and bankruptcy fraud. Further, that in order to prove a tax evasion violation, it may be necessary to utilize an indirect method of proof. Under these indirect methods, it is necessary to establish a likely source of the unreported income.

10. Your affiant knows that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of a crime; and/or (2) the objects may have been used to collect and store information about crimes in the form of electronic data. Federal Rule of Criminal Procedure Rule 41 ("Rule 41") permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of a crime; or (2) storage devices for information about a crime.

Based upon the facts set forth, computer hardware, software, related documentation, passwords, data security devices (as described below), and data may be integral tools of this crime and may constitute the means of committing it. As such, they would be instrumentalities and evidence of the violations designated. Rule 41 authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

- Hardware
  Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units; internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, video display monitors, and related communications devices (such as cables and connections, as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

- Software
  Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications (like tax preparation, word-processing, or spreadsheet programs), and utilities.

- Documentation
  Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

- Passwords and Data Security Devices
  Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

11. Affiant Sender consulted with SA Donald W. Manser, Jr., a certified Computer Investigative Specialist, employed by the IRS. He graduated from the Seized Computer Evidence Recovery School in 1998, the Network Seized Computer Evidence Recovery School in 2000, and from the Computer Investigative Specialist School at the University of North Texas in 1999. He received training in the execution of search warrants involving computers and related equipment, electronic data preservation, and the recovery, documentation and authentication of evidence.

12. Your affiant has learned from SA Manser that searching and seizing information from computers often requires agents to seize most or all electronic storage devices, including input/output peripheral devices, related software, documentation and data security devices, such as passwords, to be searched later by a qualified computer expert in a laboratory or other controlled environment. Such seizure is necessary due to the volume of evidence stored on computers and frequent attempts to conceal criminal evidence. This is true because of the following:

- The volume of evidence. Computer storage devices (like hard disks, and diskettes, can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in a random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site, especially at a personal residence.

- Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

- The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.  Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating system, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

- If, after inspecting the I/O devices, software, documentation, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

13. Data analysts may use several different techniques to search electronic data for evidence or instrumentalities of crime. These include, but are not limited to the following: examining file directories and subdirectories for the list of files they contain; "opening" or reading the first few "pages" of selected files to determine their contents; scanning for deleted or hidden data; searching for key words or phrases ("string searches").

14. It is Affiant Sender's opinion based on his experience and expertise that probable cause exists to believe that in the specified location detailed in this affidavit, which is discernible to the subject of this affidavit, contain evidence such as but not limited to all of the items mentioned in items five and six above.

15. It is Affiant Sender's opinion based on his experience and expertise in this investigation and other similar investigations that probable cause exists to believe that the subject named in this affidavit is defrauding the United States government through a tax evasion and bankruptcy fraud scheme.  It is Affiant Abrams' opinion based on his experience and expertise in this investigation that the subject named in this affidavit is operating a house of prostitution.

## **CASE BACKGROUND**

16. The following information in this affidavit is derived from observations during the course of this investigation, information conveyed to the Affiants by other law enforcement officials, interviews of witnesses, and Affiant Sender's review of financial records and documents, including those from the IRS, U.S. Bankruptcy Court and other public record sources.

17. During the course of an ongoing grand jury investigation of Fatima THOMAS (THOMAS), review of corporate tax returns and U.S Bankruptcy Court records determined that THOMAS is the 100% owner and president of ICM Body Concepts Inc. (ICM). THOMAS engaged in activities to disguise her true income and misrepresented her earnings and expenses on tax returns filed with the IRS.

18. In regards to a bankruptcy fraud scheme, THOMAS made false financial representations in relation to a bankruptcy proceeding under title 11 laws after filing a voluntary Chapter 13 bankruptcy petition.

19. Furthermore, undercover operations and a witness interview have determined that THOMAS operates a house of prostitution under the guise of a massage parlor and spa identified as ICM.

## FACTS AND CIRCUMSTANCES

### ICM BODY CONCEPTS INC BACKGROUND:

20. Affiant Sender's review of the Statement of Financial Affairs and supporting schedules submitted in July 2004 to the U.S. Bankruptcy Court in Greenbelt, Maryland and signed under penalty of perjury by THOMAS revealed the following:

   a. THOMAS started ICM in March 1998.  ICM is identified in bankruptcy schedules as being located at 1829 M St., NW, Floor #2, Washington, DC.

   b. THOMAS is President and 100% owner of the voting or equity securities for her corporation, ICM.

   c. THOMAS was the only bookkeeper and accountant from July 2002 through July 2004 who kept or supervised the keeping of her books of account and records.

   d. THOMAS stated no bonuses, loans, stock redemptions, exercise of options or any compensation in any form were paid to any insider from July 2003 to July 2004.

   e. THOMAS reported two computers as part of her household goods on bankruptcy schedules.

21. Affiant Sender's review of the 2004 ICM Corporate Tax Return filed with the IRS on August 29, 2005 and signed by THOMAS under penalty of perjury stated the following:

   a. THOMAS is the 100% owner of ICM.

   b. ICM is located at 1829 M St., NW, Floor #2, Washington, DC.

   c. ICM is a business that provides "relaxation therapy" services.

22. Affiant Sender's review of local business directories identified ICM as a massage parlor and spa.

23. Affiant Sender's review of ICM bank statements provided to the Bankruptcy Chapter 13 Trustee identified the location of this business at 1829 M St., NW, Washington, DC.

24. Inquiries made with the Washington, DC Department of Consumer & Regulatory Affairs by Affiant Sender revealed they currently do not have a record of ICM having a business license to perform massages at 1829 M St., NW, Floor #2, Washington, DC.

**FINANCIAL INVESTIGATION:**

25. Affiant Sender's review of income figures reported on bankruptcy documents and individual and corporate tax returns filed in the name of THOMAS and ICM reported the following:

(a) Summary of Individual Income Tax Returns
Fatima Thomas

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Wages | Return not filed | Return not filed | $0 | $0 | $0 |
| Business Income net of expenses |  |  | $25,847 | $36,754 | $53,175 |
| Total Income |  |  | $25,847 | $36,754 | $53,175 |
| Total Tax Owed |  |  | $524 | $2,993 | $4,642 |
| Total tax payments made | $0 | $0 | $0 | $0 | $0 |

The 2004 Individual income tax returns filed with the IRS in the name of THOMAS listed three children (Nyla Nelson, Dierakeen Thomas and Makei Thomas) as her dependants.

(b) Summary of Corporate Income Tax Returns
ICM

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Gross Receipts | Return not filed | Return not filed | $395,000 | Return not filed | $520,000 |
| Total Income |  |  | $395,000 |  | $520,000 |
|  |  |  |  |  |  |
| Officer Compensation Expense |  |  | $50,000 |  | $89,000 |
| Rent Expense |  |  | $36,459 |  | $92,250 |
| Contractor Expense |  |  | $216,388 |  | $235,594 |
| Total Deductions |  |  | $397,133 |  | $515,632 |
| Taxable Income |  |  | $0 |  | $4,368 |
| Total tax Owed |  |  | $0 |  | $0 |
| Total tax payments made | $0 | $0 | $0 | $0 | $0 |

At the writing of this document, original corporate tax returns have not been received. The information provided is based upon IRS internal information. ICM is a calendar year taxpayer whose year ends on December 31.

(c) Comparison of the income figures reported for THOMAS on individual and corporate income tax returns with the financial information from THOMAS' bankruptcy statements and schedules resulted in the following discrepancies:

| | 2000 | 2001 | 2002 | 2003 | 2004 | Total reported income 2001 – 2004 |
|---|---|---|---|---|---|---|
| Total income reported on Individual tax returns filed with the IRS in the name of Thomas | Return not filed | Return not filed | $25,847 | $36,754 | $53,175 | $115,776 |
| Total income reported as officer compensation payments to Thomas on corporate tax returns filed with the IRS in the name of ICM | Return not filed | Return not filed | $50,000 | Return not filed | $89,000 | $139,000 |
| Total Income earned by Thomas as reported on bankruptcy financial affair statements and schedules, and the 2002 individual tax return submitted to the Chapter 13 Trustee | N/A | N/A | $10,330 see footnote #1 | $120,000 see footnote #2 | $180,000 see footnote #3 | $310,330 |

Footnote #1 - THOMAS' 2002 individual income tax return provided to the Bankruptcy Chapter 13 Trustee reported total income of $10,330.

Footnote #2 - The bankruptcy statement of financial affairs report signed by THOMAS under penalty of perjury in July 2004 stated she received $120,000 in gross income from ICM in 2003.

Footnote #3 - The bankruptcy statement of financial affairs schedule I reports signed by THOMAS under penalty of perjury in July 2004 and July 2005 stated she earned between $15,000 and $17,000 in monthly gross wages from ICM.  Annualized, THOMAS earned at least $180,000 in gross wages in 2004 (i.e. $15,000 monthly income x 12 months).

26. Affiant Sender's review of evidence gathered to date has revealed that the lifestyle led by THOMAS does not appear to be possible when compared to the income reported on her individual income tax returns.

|  | 2002 | 2003 | 2004 | Totals 2002 – 2004 |
|---|---|---|---|---|
| Total income reported on individual tax returns filed with the IRS in the name of Thomas | $25,847 | $36,754 | $53,175 | $115,776 |
| Total yearly expense for mortgage payment | $54,876 see footnote #4 | 54,876 see footnote #4 | 54,876 see footnote #4 | ($164,628) |
| Total yearly expense for lease payment on 2001 Mercedes S430 | $19,320 see footnote #5 | $19,320 see footnote #5 | $19,320 see footnote #5 | ($57,960) |
| Total yearly expense for car payment on the purchase of 2000 Landrover Discovery | $9,972 see footnote #6 | $9,972 see footnote #6 | $9,972 see footnote #6 | ($29,916) |

Review of documents submitted on behalf of THOMAS to the US Bankruptcy Court revealed that as of September 2000 THOMAS had entered into contractual agreements requiring her to pay the following monthly expenses:

Footnote #4 - $4,573 in monthly mortgage payments ($54,876 annually) on her home at 16811 Federal Hill Court, Bowie, Maryland. Note - Internal IRS database records report THOMAS has paid a total of $251,542 in mortgage interest payments on her home from 2000 through 2004.

Footnote #5 - $1,610 in monthly lease payments ($19,320 annually) for a 2001 Mercedes Benz S430 leased in August 2000.

Footnote #6 - $831 in monthly car payments ($9,972 annually) for the purchase of a 2000 Landrover Discovery vehicle in June 2000.

In summary, THOMAS has reported total earned income of $115,776 to the IRS for tax years 2002 through 2004. During the same time period, THOMAS entered into contractual agreements requiring her to pay a total of $252,504 for her home mortgage and two of her vehicles (see section titled Investigation of Assets for additional information).

27. Affiant Sender's review of IRS database records as of December 19, 2005 revealed that no individual income tax returns were filed in the name of THOMAS or under her social security number for the years 2000 and 2001. Additionally, no corporate tax returns were filed in the name of ICM or under ICM's employer identification number for the years 2000, 2001 and 2003. The subject has previously filed individual income tax returns for the years 2002 through 2004 and corporate tax returns for the years 2002 and 2004.

28. Affiant Sender's review of internal IRS database records for the 2002 tax year revealed Thomas was issued a Form 1099 stating she earned $50,000 in income from ICM.  The 2002 individual income tax return filed with the IRS and provided to the Trustee reported $0 wages in Form 1099 income.

29. Affiant Sender's review of suspicious activity reports and currency transaction reports filed by financial institutions on THOMAS noted the following:

   a. From 7-21-2005 to 7-31-2005, THOMAS went to the Greyhound Bus Terminal at 1005 First St., NE, Washington, DC and sent an undisclosed number of wire transfers totaling $50,125 to an undisclosed party.

   b. THOMAS deposited cash in the amount of $45,000 into Provident Bank savings account number 100380153 in the name of ICM on 3-11-2005.

   c. From 11-13-2004 to 12-08-2004, THOMAS went to Barmy Wines and Liquor at 1912 L St., NW, Washington, DC and made 4 wire transfers on different days totaling $15,052 to the same payee, HomeQ Servicing Corp, for the payment of her home mortgage.


**BANKRUPTCY FRAUD INVESTIGATION:**

30. In December 2005 affiant Sender became aware of Chapter 13 Bankruptcy Petition # 04-26010 in the name of THOMAS.   This petition was first filed in July 2004 with the Office of the United States Trustee, District of Maryland, Greenbelt, Maryland. The bankruptcy proceedings are still ongoing as of January 2006.

31. Affiant Sender's comparison of the IRS individual income tax return filed for 2002 for THOMAS with the 2002 individual income tax return provided to the Bankruptcy Trustee noted the following discrepancies:

   a. The 2002 individual tax return for THOMAS was provided to the Bankruptcy Trustee in either March or April 2005.  The 2002 individual tax return filed with the IRS was dated August 23, 2005 and was not processed until August 29, 2005.

b. The 2002 tax return provided to the Bankruptcy Trustee reported gross business income of $236,652, total business expenses of $226,322 and net business profit of $10,330 for a separate business named "Fatima and Co." which is located in Bridgetown, Barbados in the West Indies. The 2002 tax return filed with the IRS reported gross business income of $50,000, total expenses of $24,153 and net profit of $25,847 for an unnamed business which provides office administrative services.

32. In March or April 2005 THOMAS' Attorney provided the Bankruptcy Trustee with a Statement of Income and Expenses for ICM for the 9 months ending September 2004. The statement of income and expenses was signed on January 6, 2005 by Magaline Brown, the tax return preparer for THOMAS. Affiant Sender's comparison of the figures reported on this statement with the figures reported on the 2004 corporate tax return for ICM filed with the IRS in August 2005 revealed the following:

|  | ICM Statement of income and Expenses for the 9 months ending September 2004 | ICM 2004 Corporate Tax Return filed with the IRS | Differences |
|---|---|---|---|
| Gross Income Receipts | $643,197 | $520,000 | $123,197 |
| Expenses | $405,391 | $515,632 | ($110,241) |
| Net Income | $237,000. | $4,368 | $232,632 |

Based on a comparison between the income and expense statement and the filed corporate tax return, it appears business income was understated by at least $123,000 on the 2004 corporate tax return.

33. Affiant Sender's review of internal IRS database records revealed the 2003 ICM corporate tax return provided to the Bankruptcy Trustee on behalf of THOMAS was never filed with the IRS.

34. Interim business reports for ICM from January to June 2005 were signed by THOMAS under penalty of perjury and submitted to the Trustee. The interim business reports documented utilities expense of $14,177 for the six month period ended June 2005 ($28,354 annually). Affiant Sender's review of the 2004 corporate tax return for ICM noted it reported annual utilities expense of $6,634.

**PANDERING AND PROSTITUTION  INVESTIGATION:**

35. Affiant Abrams attests that on or about December 27, 2005, at approximately 9:30pm, an Internet Crimes Against Children (ICAC) Task Force officer, acting in an undercover capacity entered the location of ICM at 1829 M St., NW Washington, DC to purchase a massage.  The business is on the second floor and was identified by the letters "ICM" on the glass door leading into the establishment. After the glass door was unlocked by an unknown employee the Officer entered the business and paid an ICM employee $110 in US currency for a half hour massage with a woman. There were several surveillance cameras present and approximately 12 females working at this business.  The officer was led into a semi-private area and after performing a body massage for approximately 15 minutes, the female offered prostitution services in the form of touching and manually stimulating the genitals of the undercover officer.  The officer refused this sexual contact and the encounter was terminated.

36. Affiant Abrams attests that on or about Friday, February 3, 2006, a second ICAC Task Force officer acting in an undercover capacity entered ICM at 1829 M St., NW, Washington, D.C.  In a scenario similar to that outlined in paragraph 19 of this affidavit, the officer paid $110 and was led into a room in which a different female employee performed a body massage on the officer.  After several minutes, the female touched and attempted to manually stimulate the genitals of the undercover officer.  The officer then requested that the touching of his genitals stop.

**WITNESS OBSERVATIONS:**

37. In January 2006 Witness One, a former employee of THOMAS at ICM was interviewed by Affiant Sender, Affiant Abrams and another Task Force representative.  The following information was provided by this witness during the course of the interview:

   a.  Witness One worked for THOMAS at ICM from approximately 2000 until 2002.

   b.  THOMAS is the sole owner and President of ICM.  Velda Bomar was the manager at ICM.

   c.  THOMAS sometimes went by the name of Erica THOMAS.  Witness One thinks Erica is THOMAS' middle name.

   d.  THOMAS taught Witness One and each massage therapist employed at ICM how to perform massages.  THOMAS told Witness One to touch the genitals of customers who paid for a massage and to provide "hand releases" to them.  The Agents understood the term "hand release" to mean masturbation to the point of ejaculation.  Witness One admitted to performing "hand releases" on customers who paid her for massages.

e.  The cost of the contact and "hand release" was included in the cost of the massage, which would be paid to THOMAS, Velda Bomar, a security guard, or another employee.  Employees dressed in bathing suits and would take off all their clothes if asked by customers.

f.  THOMAS had bragged to Witness One that she made between $200,000 and $300,000 in income a year from ICM.  Witness One could not recall the date when THOMAS made this statement.

g.  From 2001 to 2002, Witness One estimated 40 customers would visit ICM daily and pay approximately $100 for a massage session.  50% of each payment went to the employee and 50% went to THOMAS.  Cash paid by customers would be kept at a locker at the premises of ICM or on the person of whoever received the payment.  Witness One estimated ICM earned a daily gross profit of $2,000 to $3,000 per day ($600,000 annually assuming $2,000 x 6 days a week x 50 weeks).

h.  Cash received from ICM customers was deposited at the same bank account at least once a week.  Witness One thinks the account was at SunTrust Bank.  Either THOMAS, Velda Bomar or another employee would make the bank deposits.  THOMAS on occasion would take cash received at ICM before the money could be deposited in the bank.

i.  ICM customers who paid for massages with credit cards were given receipts.  Customers who paid with cash were only given receipts if requested. Witness One estimated 80% of ICM customers paid in cash and 20% paid with credit cards.

j.  During the time Witness One worked at ICM, records of customer visits to ICM were manually logged into a book that documented the date, amount paid, and type of massage session paid for by an ICM customer (i.e. 30 minute or 1 hour session).  Entries in the logbook were made either by THOMAS, Velda Bomar, or other employees. This logbook was maintained at the office of ICM.

k.  For a number of months, Witness One lived at the home of THOMAS at 16811 Federal Hill Court, Bowie, MD.  Witness One occasionally observed THOMAS performing work related to ICM at this home.

l.  Nelson Vaden lives with THOMAS at 16811 Federal Hill Court, Bowie, MD and they are the parents of a two-year-old daughter named Nyla Nelson.
(Note: Affiant Sender's review of IRS database records as of December 30, 2005 revealed that no individual income tax returns were filed in the name of Nelson Vaden or under his social security number for the years 2001, 2002, 2003 and 2004.)

m.  Witness One had information that THOMAS attempted to establish retail clothing stores in Guyana, Trinidad and Barbados.  Witness One recalled the businesses went either by the name of "Fatima and Company" or "Fatima's Boutique."

n.  Witness One stated she was aware that "American Body Concepts Inc" and "Beautiful Image" were the names of past businesses owned and operated by THOMAS.  The Witness was not involved in the operations of these businesses and did not know if they were still operational.

**PERSONAL OBSERVATIONS:**

38. On or about December 19, 2005 at 10:30 p.m., Affiant Abrams and Mathew Baechtle retrieved garbage from green receptacles located on the street directly in front of the residence of THOMAS at 16811 Federal Hill Court, Bowie, MD.  One large black garbage bag was retrieved and subsequently examined at the Prince George's County Police Department, District 2.  Recovered in the large garbage bag was a small plastic bag tied closed.  Discovered within this smaller bag were wrappers from "blunt" style cigars and what appeared to be tobacco from these cigars.  Also discovered within was vegetative material that looked and smelled like marijuana.  Based on knowledge and training, affiant Abrams is aware that smokers of marijuana often purchase inexpensive cigars, empty them of tobacco, and fill the cigar papers with marijuana.  The vegetative material seized by SAs Abrams and Baechtle was tested on or about December 20, 2005 using an ODV, Narco-Pouch with #908 Duquenois-Levine reagent.  The vegetative material produced a positive result for the presence of marijuana.

39. On January 24, 2006, at approximately 12:10 a.m., Affiant Abrams and Sender retrieved garbage from green receptacles located on the street directly in front of the residence of THOMAS at 16811 Federal Hill Court, Bowie Maryland.  One large red bag was recovered from the trash receptacles and was transported to the Prince George's County Police Department, District 2 for examination.  The following items were observed in the large red bag:

a.  Vegetative matter consistent with the look and smell of marijuana was found in a smaller bag within the large red bag recovered.  This material was tested on or about January 25, 2006 using an ODV, Inc Narco-Pouch with #908 Duquenois-Levine reagent.  This material tested positive for the presence of marijuana.

b.  A small plastic zip-lock-style bag containing approximately 10 (ten) smaller zip-lock-style bags that were green in color.  Based on knowledge, training and experience, and through conversations with other law enforcement agents, Affiant Abrams submits that these smaller green bags are consistent with the packaging and distribution of controlled substances.

c.  A black laminated card with the words, "I.C.M. Body Concepts V.I.P. Membership Card" on one side and the statement, "Can also be used at American Body Concepts" written on the other side of the card.  Based on knowledge, training and experience, Affiant Sender views this as evidence that business related materials are kept at this residence.

40. Provident Bank officials informed Affiant Sender that the mailing address for account # XXXXXXXX in the name of Madierny Enterprises is 16811 Federal Hill Court, Bowie, Maryland.  Fatima THOMAS is listed on Provident bank records as the sole proprietor of Madierny Enterprises.  Additionally, 16811 Federal Hill Court, Bowie, Maryland is the mailing address for account # XXXXXXXXX in the name of Fatima THOMAS.

41. A mail cover conducted on THOMAS' home at 16811 Federal Hill Court, Bowie, Maryland by Affiant Sender revealed that on January 18, 2006 Arundel Gas and Water Company sent correspondence to THOMAS at the above address.  On January 20, 2006 Arundel Gas and Water Company and the Comptroller of Maryland Revenue Administration Division sent correspondence to THOMAS at the above address.

42. Affiant Sender's review of registered companies within the District of Columbia identified THOMAS as the registered agent for an organization named American Body Concepts Inc. located at 1012 H St., NE, Washington, DC.  The initial date of registration for this organization was September 14, 2001.  The registration status for American Body Concepts Inc. is currently revoked.

**INVESTIGATION OF ASSETS:**

43. Property record research conducted at the Maryland Land Records Department by Affiant Sender revealed the following:

   a. THOMAS purchased the land identified as 16811 Federal Hill Court, Bowie, MD on August 26, 1997 for $97,900.  THOMAS borrowed $450,000 from FCNB Bank on August 26, 1997 and $500,000 from Alternative Mortgage Funding Corp on November 5, 1999.  The debt to FCNB Bank was discharged on November 19, 2005.  The monthly mortgage payment for THOMAS as of December 1999 was $4,573.

   b. The two story primary structure was built on 16811 Federal Hill Court, Bowie, Maryland in 1999.  The base value of the land and property at this time was $468,420.  The assessed value of 16811 Federal Hill Court, Bowie Maryland as of January 1, 2005 was $512,680.

44. Affiant Sender's review of real estate records filed with the U.S Bankruptcy Court in Greenbelt, Maryland revealed a June 2004 appraisal of Thomas' home at 16811 Federal Hill Court, Bowie, Maryland listed the value at $665,000.

45. Affiant Sender's review of State of Maryland Department of Motor Vehicles records revealed that the following vehicles were acquired by THOMAS:

    a. 1999 Ford Expedition purchased in September 1999 for $30,908 with a lien of $28,523.

    b. 2000 Land Rover Discovery purchased in June 2000 for $43,569 with a lien of $41,471

    c. 2001 Mercedes Benz S430 leased in August 2000

46. Affiant Sender's review of motor vehicle records filed with the U.S Bankruptcy Court in Greenbelt, Maryland revealed the following:

    a. Terms of the 2001 Mercedes Benz S430 lease signed by THOMAS required her to make 48 monthly payments of $1,610.81 ($77,318 total) commencing on September 2000. As of August 2004, THOMAS' past due balance owed on her Mercedes Benz lease was $1,572.43.

    b. Terms of the 2000 Land Rover Discovery sales contract signed by THOMAS state she made a cash down payment of $2,300 and agreed to make 72 monthly payments of $831.37 ($59,858 total) commencing on August 2000. As of August 2004, THOMAS' past due balance owed on the sales contract for her Landrover was $880.74.

## <u>CONCLUSION OF AFFIANTS</u>

47. It is Affiant Sender's opinion based upon their experience and expertise in this investigation and other similar investigations that probable cause exists to believe that the subject named in this affidavit has disguised her true income and misrepresented her earnings on tax returns filed with the IRS.  Additionally, the subject named in this affidavit has made false financial representations in relation to a proceeding under title 11 bankruptcy laws after the filing of the voluntary petition.

48. It is Affiant Abrams' opinion based upon his experience and expertise in this investigation and other similar investigations that probable cause exists to believe that the subject named in this affidavit is the owner of a massage parlor where employees offer sexual favors to customers in exchange for money.

49. Based upon the foregoing, Affiant Sender and Abrams have probable cause to believe that currently contained within the location identified above in this affidavit are those items outlined in Attachment B which constitute evidence, fruits, and instrumentalities of violations of Title 26, United States Code, Section 7201 (Tax Evasion) and Section 7206(1) (False Income Tax Returns), Title 18, United States Code Section 157 (Bankruptcy Fraud), and Title 22, District of Columbia Code section 2705 (pandering; inducing or compelling an individual to engage in prostitution)

50. Therefore, Affiant Sender and Abrams request that a warrant be issued for the affiants to search the business of THOMAS located at 1829 M St., NW, Floor # 2, Washington, DC (identified above in this affidavit) and seize those items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Title 26 U.S.C. Section 7201 and Section 7206(1) (False Income Tax Returns), Title 18 U.S.C. Section 157 (Bankruptcy Fraud), and Title 22, District of Columbia Code section 2705 (pandering; inducing or compelling an individual to engage in prostitution).

_____
Don Sender
Special Agent, IRS-CID


_____
Robert Abrams
Special Agent, ICE

Subscribed and sworn to before me

This _____ day of _____, _____.


_____
UNITED STATES MAGISTRATE JUDGE

21

**Attachment A**

**LOCATION TO BE SEARCHED**

1829 M Street, NW, Floor #2, Washington, DC is on the second floor of a three story "townhouse" type structure located in a commercial area on the north side of M Street in NW Washington DC.  The exterior of the three story structure is gray with a composition that appears to be concrete.  The number 1829 is displayed in black writing above the entrance and below a white awning.  The entrance to the first floor has a white door and is located at the top of a set of steps.  The entrance is situated between a yellow awning displaying "House of Kabob" and a green awning displaying "The Psychic Shop."

**ITEMS TO BE SEIZED**

**ATTACHMENT B**

All items listed in the paragraphs below, whether stored in hard copy or computer, for the period January 1, 2000 to the present; which are fruits, instrumentalities, and evidence of violations of Title 26, USC, § 7201 (Attempt to Evade or Defeat Tax), § 7206(1) (Filing False Income Tax Returns), as well as Title 18, USC, § 157 (Bankruptcy Fraud) and Title 22, District of Columbia Code section 2705 (pandering; inducing or compelling an individual to engage in prostitution).

Based on the facts as listed in the affidavit, Affiant Sender and Abrams have probable cause to believe the following items are located at 1829 M St., NW, Floor # 2, Washington, DC.  These records relate to:  Fatima THOMAS, Erica THOMAS, ICM Body Concepts, Madierny Enterprises, American Body Concepts, Fatima and Company, Fatima's Boutique, Velda Bomar, Nelson Vaden and all other personal and business records which appear to be associated with the above named individuals and/or entities which are evidence of the above-identified violations for the period January 1, 2000 to the present.

1.  Tax records, including retained copies of federal, state, and local corporate, partnership, business, personal, and sales and use tax returns, filed or not filed, and supporting notes, work papers, summary sheets and analyses used in preparation of the tax returns; and tax forms, including Forms W-2; Forms 1099; and Forms 1098. Any correspondence with the IRS and state taxing authorities.

2.  Bankruptcy and IRS information including: books, magazines, booklets, pamphlets, publications, newsletters, letters, correspondence, tape recordings, video tapes, and other literature concerning bankruptcy and Internal Revenue laws and their interpretations.

3.  Financial instruments, including stocks and bonds, negotiable bank checks, bank drafts, cashiers checks, money orders or any other negotiable instruments.

4.  Financial records, as follows:

    A.  Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes, and work papers;

    B.  All correspondence, letters, memorandums, applications, powers of attorney, and listings, which contain financial information, such as income, expenses, assets, liabilities, transfer of money, clients, or accounts;

    C.  Bank or financial institution records, including bank statements, passbooks, deposit slips, deposited items, withdrawal slips, cancelled checks, bank receipts, bank checks, money order receipts, wire transfers, credit and debit memos, and safe deposit keys and records;

D.  Bank and financial institution records and other records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency;

E.  Records of purchase and sale of assets and investments including stocks and other securities, including statements, receipts and account applications;

F.  Records of real estate transactions, including contracts, agreements, settlement sheets payments and receipts of money;

G.  Records of loans or letters of credit including contracts mortgages, notes agreements, applications payments and financial statements;

H.  Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

I.  Records of purchase and/or financing of assets including statements, receipts, and payment records;

J.  Records of expenditures including payments, receipts, invoices, statements, photographs, and other evidence of the expense;

K.  Records of income from any source, including fee schedules, records of fees charged, copies of checks and deposit slips;

L.  Records indicating the purchase, lease, rental, possession, or maintaining of equipment, real estate vehicles, capital assets and any other assets;

M.  Records of personal and living expenses including bills, payments, receipts, statements, photographs, digital and video recordings, passports, airline tickets, records of travel, and other evidence of the expense;

5.  Employment records and personnel files including employees lists, names, addresses, and duties of employees, applications, Forms W-2,1099, W-4, employment tax returns, ledgers, payroll journals, payroll records and correspondence.

6.  Insurance records.

7.  Storage facility and safety deposit box records and keys.

8.  Post Office box records.

9.  Records of forming and operating corporations, partnerships, trusts, limited liability companies, associations, businesses, and any other entities, along with contacts agreements, articles of incorporation or formation, minutes of meetings of the board of directors, officers, partners, or members, and partnership agreements and business filings.

10. All documents reflecting the names of businesses that are possible shell corporations, business fronts, partnerships, corporate entities, and any nominees.

11. Address books, telephone books, rolodex indices, lists, and any papers, computerized or electronic records reflecting names, addresses, telephone numbers, pagers numbers, fax numbers, e-mail addresses, and web sites of possible clients, customers, creditors, financial institutions, and other individuals or businesses with whom a financial relationship exists.

12. Items related to the business of prostitution, including condoms and lubricants, and invoices for the purchase of such items.

13. Any and all documents pertaining to the business of prostitution, including phone records, phone numbers, address books, correspondence and notes.

14. All United States currency and foreign currency greater than $50 US dollars.

15. The above paragraphs, include all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored, including, any handmade form (such as writing, drawing, or painting); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion picture, photocopies); any mechanical form (such as printing or typing); and any electrical, electronic, or magnetic form or data (such as any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-roms, optical discs, backup tapes, printer buffers, smart cards, USB storage devices, memory calculators, pagers, personal digital assistants such as Palm Pilots, as well as printouts or readouts from any magnetic storage device).

16. In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described in the affidavit are also to be seized and searched off-site in the manner which is also described in the affidavit. "Mirroring", "imaging", and/or replication are also authorized.

17. Any and all information and/or data as described in the above paragraphs which are stored in the form of magnetic or electronic coding or computer coding or computer media or on media capable of being read by a computer or with the aid of computer related equipment.  This media includes computer software such as floppy disks, fixed hard drives, removable hard disk cartridges, tapes, laser disk, video cassettes, and other media which is capable of storing magnetic coding. The search procedure of the electronic data contained in computer operating software or memory devices, whether performed on site or in a laboratory, or other controlled environment, may include the following techniques:

a. surveying various files "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain certain files);

b. "opening" or cursorily reading the first few "pages" of files in order to determine their precise contents;

c. "scanning" storage areas to discover and possibly recover recently deleted data;

d. scanning storage areas for deliberately hidden files; or

e. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

18. Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, personal digital assistants or other portable electronic devices such as a Pal Pilot or Blackberry, and other computer related electronic devices.

19. Any and all instructions or programs stored in the form of electronic or magnetic media, which are capable of being interpreted by a computer, or related components. The items to be seized could include but would not be limited to operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission. Any and all written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or related devices.

20. Any safe or locked storage container or any contents thereof if and to the extent said contents fall within categories 1 through 19 stated above.

Appropriate efforts shall be made to minimize the disclosure of records and other information that is not the subject of this warrant.